## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RYAN KELLEY,** | |
| **Plaintiff,** | **CIVIL ACTION NO. _____** |
| **v.** | |
| **STRADOS LABS, INC.,** | **JURY TRIAL DEMANDED** |
| **and** | |
| **NICHOLAS DELMONICO,** | |
| **Defendants.** | |

## COMPLAINT AND JURY DEMAND

Plaintiff Ryan Kelley, by and through her attorneys, Bell & Bell LLP, hereby files the following Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1. This is an action for an award of damages, attorneys' fees and other relief on behalf of Plaintiff Ryan Kelley, a former employee of Strados Labs, Inc. ("Strados" or "Defendant"). Ms. Kelley has been harmed by Defendant Strados' harassment and discrimination on the basis of her sex, and Defendants' retaliation for complaining about discrimination and harassment, culminating in her wrongful termination on March 7, 2024. Ms. Kelley has also been harmed by Defendant's gender-based unequal pay in violation of the Equal Pay Act ("EPA"), and retaliation for complaints Ms. Kelley raised about unequal pay in violation of the EPA. Ms. Kelley was also wrongfully terminated in retaliation for objecting to and complaining about legal compliance issues that she reasonably believed to be in violation of law, in violation of the Minnesota

Whistleblower Act.  Nicholas Delmonico, Chief Executive Officer of Strados, retaliated against Ms. Kelley for her complaints about discrimination and harassment, and aided and abetted Strados' discrimination, harassment and retaliation as alleged herein.

2.    This action is filed pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq. ("Title VII"), the Minnesota Human Rights Act, Minn. Stat. § 363A.01, et seq. ("MHRA"), the Minnesota Whistleblower Act, Minn. Stat. § 181.931 et seq. ("MWA"), the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA").

## JURISDICTIONAL STATEMENT

3.    This Court has original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331 and 1391.

4.    The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1343(4), which grants the District Court original jurisdiction in any civil action authorized by law to be commenced by any person to recover damages to secure equitable or other relief under any act of Congress providing for the protection of civil rights.

5.    This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

6.    All conditions precedent to the institution of this suit have been fulfilled. On December 17, 2024, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual-filed as a Complaint with the Minnesota Department of Human Rights ("MDHR"). On November 14, 2025, the EEOC issued a Notice of Right to Sue to Plaintiff. This action has been filed within ninety (90) days of Plaintiff's receipt of said Notice.  With respect to the MDHR claims herein, Plaintiff will serve a copy of the Summons and Complaint in this matter on the MDHR.

## VENUE

7.   This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b).

8.   This action properly lies in the Eastern District of Pennsylvania because significant activities associated with the claims arose in this judicial district.

## PARTIES

9.   Plaintiff Ryan Kelley is an adult female citizen and resident of Chanhassen, Minnesota and the United States of America.

10. Defendant Strados Labs, Inc. is a Delaware corporation with its corporate headquarters and principal place of business in Philadelphia, Pennsylvania.

11. Defendant Nicholas Delmonico is, upon information and belief, a citizen and resident of Princeton, New Jersey.

12. At all relevant times, Defendant Strados is and has been an employer employing more than fifty (50) employees.

13. At all relevant times, employees of Defendant Strados acted as agents and servants for Defendant Strados.

14. At all relevant times, employees of Defendant Strados were acting within the scope of their authority and in the course of employment under the direct control of Defendant Strados.

15. At all times material hereto, Defendant Strados acted by and through its authorized agents, servants, workmen and/or employees acting within the course and scope of their employment with Defendant Strados and in furtherance of Defendant Strados' business.

16. At all relevant times hereto, Plaintiff Ryan Kelley was an "employee" of Defendants within the meanings of the laws at issue in this suit and is accordingly entitled to the protection of said laws.

17. At all relevant times hereto, Defendants each were an "employer" and/or "person" under the laws at issue in this matter and are accordingly subject to the provisions of said laws.

18. This cause of action arose out of transactions or occurrences that took place in whole or in part in the Eastern District of Pennsylvania.

19. Defendants do significant business within the Commonwealth of Pennsylvania.

20. This Honorable Court has jurisdiction over Defendants.

## FACTS

21. Ms. Kelley began her employment with Defendant Strados in June 2022 as General Counsel and Corporate Secretary in a part-time capacity.

22. Throughout her employment, Ms. Kelley performed a significant portion of her duties remotely, from her home in Minnesota.

23. Throughout her employment, Strados' corporate headquarters and principal place of business was located in Philadelphia, Pennsylvania.

24. Throughout her employment with Strados, Ms. Kelley excelled in her position and performed her duties in a competent and satisfactory manner.

25. Despite her loyalty and consistent performance, however, Ms. Kelley was subjected to discrimination and harassment on the basis of her sex, retaliation for complaining about discrimination and harassment, unequal pay compared to similarly situated males performing equal work, retaliation for complaining about unequal pay, and retaliation for objecting to and

complaining about legal compliance issues, culminating in her wrongful termination on March 7, 2024.

26. Ms. Kelley accepted the part time offer on June 17, 2022 and began employment with Strados a few days later, with an arrangement to transition to full-time employment with Strados within approximately three to four months.

27. Upon her hire, Ms. Kelley immediately began proving herself to be a qualified and capable employee, resulting in Nicholas Delmonico, Chief Executive Officer, entering into serious discussions in or about mid to late October 2022 regarding bringing Ms. Kelley on as a full-time employee.

28. Eventually, Ms. Kelley was offered full-time employment with an annual base salary plus 16,000 option grant.

29. Though this salary was not market rate and did not adequately reflect the value that Ms. Kelley brought to Strados, Ms. Kelley accepted the position following verbal assurances from Mr. Delmonico that her salary would swiftly be adjusted to a market-competitive salary.

30. On November 11, 2022, Ms. Kelley began full-time employment with Strados.

31. During her employment with Strados, Ms. Kelley repeatedly faced discrimination and harassment on the basis of her sex, including, without limitation, sex-based pay discrimination.

32. On or about May 23, 2023, several male members of Strados' leadership team received significant wage increases.

33. Nicholas Delmonico, Chief Executive Officer, received a raise representing a 17.5% increase with a salary more than $60,000 per year higher that Ms. Kelley, and Richard Powers, Chief Product Officer, saw his salary raised by 17.4%, with an annual salary more than $50,000 per year more than Ms. Kelley.

34. Jason Kroh, Chief Technology Officer, similarly received a raise on May 23, 2023 representing a 14% increase and putting his salary nearly $25,000 than Ms. Kelley's, and saw his salary raised again on August 23, 2023 an additional 9% putting his salary approximately $40,000 higher than Ms. Kelley's.

35. Ms. Kelley, on the other hand, despite the assurances from Mr. Delmonico that her salary would promptly be brought to a market-competitive rate, saw no increase in her salary.

36. Despite the fact that since her hire, Ms. Kelley had not been compensated at a rate that corresponded with the gains she brought to Strados, Ms. Kelley continued to work diligently to increase Strados' business.

37. In fact, in late Fall 2022, Ms. Kelley supported Strados' collaboration with two companies on new clinical trials and pilot studies.

38. Additionally, Ms. Kelley was instrumental in securing several revenue-generating contracts.

39. For example, in early June 2023, Ms. Kelley helped to successfully secure a significant master agreement with a Chinese pharmaceutical company in collaboration with Shane Krauss, Director of Strategy and Business Development, that delivered a stable revenue stream for Strados.

40. This was no easy feat. In order to successfully procure this agreement, Ms. Kelley drafted a contract from scratch, operationalized the pharmaceutical contracting program at Strados, and guided months of negotiations.

41. Ultimately, this agreement was a significant accomplishment for Strados and would not have been possible without Ms. Kelley's dedication, expertise, and diplomacy.

42. Despite her crucial contributions to Strados, Mr. Delmonico repeatedly spoke to Ms. Kelley in a criticizing and condescending manner and arbitrarily attempted to remove her from important tasks – conduct he did not similarly subject male employees of Strados to.

43. By way of example, notwithstanding the fact that Ms. Kelley had just drafted a successful contract mere weeks prior, on June 16, 2023, Mr. Delmonico told Ms. Kelley that he was removing her from the task of developing a contract for a Scientific Advisory Board (SAB), claiming that "It's too sensitive and I need authority to run with it as CEO of this business…"

44. This followed an aggressive message exchange on Slack where Mr. Delmonico was dissatisfied with an agreement drafted by Ms. Kelley that he had already approved after several SAB candidates signaled their intention not to sign the agreement.

45. Mr. Delmonico repeatedly told Ms. Kelley that she needed to "fix" the agreement.

46. Ms. Kelley offered multiple potential explanations for the candidates' disapproval of the agreement, and offered potential solutions.

47. Mr. Delmonico continued his aggressive tone, writing, "No, that's a lot of work and I'm not even clear on why this distinction matters. You sold me on a consulting agreement being cleaner and it's not working. So I can't agree with that plan. Can [sic] you please just change the undesirable terms or remove them entirely…"

48. Ms. Kelley patiently explained that they had already had a conversation about the distinctions between consulting and advisory agreements and why the removal of the "undesirable" terms would result in a consulting agreement.

49. Mr. Delmonico merely replied, "The terms don't work, please fix them."

50. Mr. Delmonico then told Ms. Kelley to stop working on this deliverable as he was going to reach out to other companies for advisor agreements and that he was taking this task "off [her] plate."

51. This effectively undermined Ms. Kelley and her position as General Counsel and Corporate Secretary.

52. In a meeting the following week, Mr. Delmonico stated that he finally understood the difference between advisory and consulting agreements and ultimately had Ms. Kelley draft a consulting agreement to send to the SAB candidates.

53. During this meeting, Ms. Kelley complained to Mr. Delmonico about sex discrimination and harassment, specifically asking him if he would treat or communicate with Mr. Powers, Mr. Kroh, or Mr. Krauss – all male employees – in the manner that he had treated and communicated with her on June 16, 2023.

54. Mr. Delmonico was offended by this question and conceded only that he was an "aggressive texter."

55. However, the discrimination and harassment continued, and Ms. Kelley was soon retaliated against for complaining about discrimination and harassment, and Mr. Delmonico began subjecting Ms. Kelley to an increased level of scrutiny.

56. In August 2023, Ms. Kelley learned that the variance in compensation between herself and the male staff at Strados extended beyond salary to also include option grants.

57. Ms. Kelley discovered during Quarter 2 Board meeting preparations that Mr. Delmonico, Mr. Powers, and Mr. Kroh – all C-suite executives – were allocated substantial option grants ten to twenty times greater than those granted to Ms. Kelley, intended as a 2023-year-end annual bonus.

58. Moreover, Ms. Kelley's number of options matched the level given to the male Lead Software Developer, Callum Gouveia Da Silva, despite the fact that Ms. Kelley's position as General Counsel and Secretary was a more senior position.

59. It was also at this time that Ms. Kelley was made aware that she was listed as an "employee" rather than a member of executive management.

60. This categorization was surprising, as Ms. Kelley's official duties aligned with the role and responsibilities of a Chief Legal Officer – also a C-suite executive designation.

61. The classification of Ms. Kelley's position as "employee" rather than executive management and the disparity in allocation of option grants came without prior discussion or justification, highlighting a significant contrast in recognition and reward provided to Ms. Kelley compared to the male executives.

62. Yet again, despite the fact that Ms. Kelley was not receiving acknowledgement and compensation that was proportionate to the profit and benefit she was bringing to Strados, Ms. Kelley continued to remain committed to her position and maintained her efforts to effectively prepare for the Q2 board meeting, streamline processes, and ensure compliance.

63. Ms. Kelley's ability to execute all her deliverables was complicated, however, by the lack of decisiveness on the part of Mr. Delmonico.

64. This lack of effective decision-making and communication was also present with other male employees throughout Ms. Kelley's employment at Strados.

65. By way of example, on June 23, 2024, Ms. Kelley conducted a 2-hour patent and invention disclosure training, which was recorded, with relevant company personnel, including Strados' leadership.

66. During the training, Ms. Kelley discussed the use of an invention disclosure form and the invention disclosure and patenting process, and Ms. Kelley, Mr. Kroh and Mr. Powers agreed that several invention disclosures should be completed.

67. Although Ms. Kelley requested that invention disclosures be completed to start this process on the few inventions that were discussed in that meeting, no invention disclosures were ever completed and returned to Ms. Kelley.

68. Subsequently, Ms. Kelley re-sent the invention disclosure form and thoroughly discussed the components that needed to be submitted in writing to start the patenting process, as well as the steps that would take place after disclosure and several more product planning meetings were subsequently held.

69. Yet, Ms. Kelley never received any invention disclosures, and the level of detail discussed in these meetings was insufficient to support even a basic provisional patent filing.

70. On August 26, 2023, Mr. Delmonico once again engaged in an aggressive and dismissive conversation with Ms. Kelley after he requested that Ms. Kelley draft convertible note agreements (CNA) for two board members, with minimal information provided.

71. Ms. Kelley produced a CNA per standard procedure.

72. However, Mr. Delmonico became frustrated when Ms. Kelley told him that she would send the agreements to the Board members over Docusign, which was standard practice for a CNA, as it is a controlled document.

73. Mr. Delmonico insisted that Ms. Kelley send him a Word version of the CNA.

74. Ms. Kelley expressed discomfort over sending an editable version of the CNA, and thus emailed Mr. Delmonico a PDF of the CNA where the note amount, date, and signature detail portions could easily be filled in by the board members.

75. However, Mr. Delmonico escalated the conversation, saying that it sounded like Ms. Kelley was "countering" him and that he was going to send the board members a blank version for review.

76. Ms. Kelley responded that while it was fine to send a blank note, it was an approach that Strados had not taken before regarding a CNA during her tenure, and thus she had followed the usual process.

77. Mr. Delmonico admonished Ms. Kelley and wrote, "I asked you to do it the way I described for that exact reason though," despite the fact that Mr. Delmonico had not provided Ms. Kelley with details on how to prepare the CNA.

78. Ms. Kelley also raised a number of concerns regarding the CNA with Mr. Delmonico that she believed represented unethical and/or impermissible practices and compliance concerns, but Mr. Delmonico refused to correct the issues or address Mr. Kelley's concerns.

79. Everything that transpired with the CNA made several matters abundantly clear to Ms. Kelley.

80. Firstly, Mr. Delmonico would not cease in his practice of undermining her and shutting her out.

81. This was made further evident after Ms. Kelley learned that Mr. Delmonico would regularly communicate with shareholders without informing her or consulting with her.

82. In or about the end of August or beginning of September 2023, Ms. Kelley raised with Mr. Delmonico the need to send notice of the note cap amendment to all of the noteholders.

83. It was then that Ms. Kelley learned that Mr. Delmonico routinely sent updates to shareholders, even though Ms. Kelley had never been informed of these updates and had never been copied on any shareholder or investor communication.

84. Ms. Kelley requested that she review the communications and updates prior to release, but Mr. Delmonico refused, stating that his "wings had already been clipped too much."

85. Ms. Kelley then requested that she be copied on these communications moving forward – another request Mr. Delmonico refused.

86. Secondly, Mr. Delmonico tended to flout legal compliance.

87. The retaliation against Ms. Kelley for urging and attempting to enforce compliance came swiftly.

88. Beginning August 30, 2023, Mr. Delmonico began frequently cancelling their one-on-one meetings, hindering Ms. Kelley's ability to effectively communicate with him for the months of September and October 2023, which further complicated her work and deliverables.

89. Furthermore, though Ms. Kelley did receive a raise on September 15, 2023, it was a very modest raise representing a 5.25% increase, which was far lower than the raises Mr. Delmonico, Mr. Powers, and Mr. Kroh had received in May 2023 of 17.5%, 17.4%, and 14% (with an additional 9% in August 2023), respectively.  Ms. Kelley was still earning far less than her male counterparts.

90. Moreover, Mr. Delmonico's repeated subversion and admonishing of Ms. Kelley continued unabated.

91. As Ms. Kelley and Mr. Delmonico began preparing for an upcoming board presentation and board meeting in early November 2023, Mr. Delmonico continually disregarded Ms. Kelley's suggestions, recommendations, and professional judgment.

92. Mr. Delmonico also became very upset after he failed to send out the final version of board meeting minutes with a minor change that had consolidated two sentences into one, haranguing Ms. Kelley for this mistake when it had been caused by a failure in synching

properties in SharePoint, and despite the fact that Ms. Kelley had proposed an easy solution where the notes could be reviewed and approved by the board in real time.

93. Additionally, Mr. Delmonico sent a deprecatory and dismissive Slack message to Ms. Kelley on October 31, 2023, attempting to remove a deliverable from her after he had failed to provide her with sufficient information, nor included her in conversations that would have provided her with the necessary information, to prepare the deliverable.

94. Shortly thereafter, Mr. Delmonico again engaged in his – now increasingly routine – practice of shutting Ms. Kelley out of important conversations and decisions.

95. At the same time as freezing Ms. Kelley out, Mr. Delmonico also began needlessly including Mr. Powers into his weekly meetings with Ms. Kelley, which were now reorganized into "legal admin meetings."

96. At the first such meeting in or about November 2023, Mr. Delmonico expressed concerns over an issue that was being addressed by a fractional general counsel, Alyson Decker.

97. In response, Ms. Kelley explained that she did not have much for Ms. Decker to do despite her best efforts to keep Ms. Decker busy and acknowledged that Ms. Decker would not have the immediate turnaround on agreements that Mr. Delmonico demanded.

98. Ms. Kelley pointed out that she had advised against the additional expense of retaining a fractional counsel in August 2023, causing Mr. Delmonico to become very angry.

99. Mr. Delmonico's tendency to become aggressive and angry with Ms. Kelley was becoming all too familiar to her.

100.    The months of November and December 2023 were similarly marked by an increase in scrutiny and subversion of Ms. Kelley by Mr. Delmonico and Mr. Delmonico repeatedly questioned the efficiency of the legal review process.

101.    This heightened scrutiny, amidst last-minute meeting cancellations and shifting priorities, underscored a punitive approach towards managing legal responsibilities and a disregard for Ms. Kelley's professionalism and expertise, further creating a hostile work environment.

102.    Notwithstanding the former, Ms. Kelley continued to prepare meeting agendas per Mr. Delmonico's ever evolving specifications, delivered promised materials in a timely manner, and followed the agreed upon prioritization of Ms. Kelley's time according to what was discussed during the legal admin meetings.

103.    In December 2023, Ms. Kelley complained to Mr. Powers and Mr. Kroh about Mr. Delmonico's behavior towards her, including Mr. Delmonico's angry outbursts and other abusive conduct.

104.    Ms. Kelley stated that she did not want to be Mr. Delmonico's "whipping girl," indicated that she believed she was being treated differently than others, and asked if Mr. Delmonico treated Mr. Powers and Mr. Kroh, two male executives, in the same way.

105.    Though Mr. Powers and Mr. Kroh conceded that Mr. Delmonico "could be hard to deal with," they failed to provide any examples of mistreatment that were comparable to what Ms. Kelley had experienced.

106.    They then provided suggestions for how to approach interactions with Mr. Delmonico, which Ms. Kelley adopted.

107.    Following one of the suggestions, and Mr. Delmonico calling Strados' different outside counsel without consulting Ms. Kelley to demand a list of items they had worked and were working on for Strados, Ms. Kelley included an "outside counsel" section to the legal admin meeting agenda.

108.     In the next meeting, upon Ms. Kelley showing him this new agenda section, Mr. Delmonico evasively stated that he had contacted outside counsel about alleged tax treatment of expenses corresponding to legal matters.

109.     On January 24, 2024, Ms. Kelley messaged Mr. Delmonico and Mr. Powers on Slack to inquire as to whether the Series A financing documents provided by Ballard Spahr when Strados moved to in-house counsel were missing any side letter agreements or other documentation of board observer rights.

110.     Mr. Delmonico, unsurprisingly, became aggressive once again, accusing Ms. Kelley of overlooking important matters and being willing to risk non-compliance.

111.     Ms. Kelley explained that as these documents pre-dated her employment at Strados, it was not possible for her to know whether there were any outstanding agreements or documentation.

112.     Ms. Kelley also stated that she worked extraordinarily hard for Strados and yet felt continuously undervalued and underappreciated.

113.     Rather than take this opportunity to reassure Ms. Kelley that she was valued and appreciated, Mr. Delmonico continued to criticize Ms. Kelley.

114.     Mr. Delmonico also proceeded to cancel their legal admin meeting that was scheduled for that day, continuing his practice of shutting Ms. Kelley out and failing to maintain adequate communication.

115.     Ms. Kelley requested that they touch base later that day, but Mr. Delmonico never complied and instead pressed on Ms. Kelley to make sure that the Series A financial documents were in order for upcoming due diligence, which was exactly what Ms. Kelley had been trying to do when she contacted him to ask whether there was any missing documentation.

15

116.    Throughout February 2024, Mr. Delmonico's demands became increasingly unreasonable.

117.    By way of example, Mr. Delmonico, Mr. Powers, Mr. Kroh, Ms. Kelley, and Mr. Krauss were scheduled to meet in Atlanta for a strategy session to prepare for the Quarter 4 and End of Year upcoming board meeting scheduled for the first week of March 2024.

118.    Ms. Kelley raised with Mr. Delmonico her desire to prepare slides to facilitate a parallel discussion around Intellectual Property (IP) strategy – an area where it was necessary for research and design (R&D) and legal to collaborate to define a strategy for Strados and where Ms. Kelley had not been adequately apprised during her employment at Strados.

119.    As this meeting neared, the demands on Ms. Kelley's time increased, culminating in Mr. Delmonico directing Ms. Kelley to finalize a lengthy redlined agreement with a third-party company over preparing these "unsolicited" slides.

120.    In the subsequent weeks after the Atlanta strategy session, Mr. Delmonico became very angry with Ms. Kelley for not preparing an IP strategy for Strados – the very thing that Ms. Kelley had attempted to do but that Mr. Delmonico had thwarted her from accomplishing.

121.    Despite the interference by Mr. Delmonico, after a significant investment of time over the course of two weeks, Ms. Kelley finalized a draft of an IP strategy, which also included additional input from Mr. Kroh, to facilitate further discussion with the product roadmap prepared in the strategy session earlier that month.

122.    Ms. Kelley repeatedly tried to meet with Mr. Delmonico and Mr. Powers to review and obtain input to finalize the IP strategy and associated slides that would be shared at an upcoming board meeting.

123.    However, Mr. Delmonico would cancel the meetings last minute because "there was nothing to discuss," despite the fact that Mr. Delmonico had berated Ms. Kelley for not preparing an IP strategy for Strados mere weeks ago.

124.    Mr. Delmonico then later became angered because he did not know what "IP issues" were on Ms. Kelley's plate, despite them always being mentioned and all related expenses being approved by Mr. Delmonico.

125.    This accusatory tone that Mr. Delmonico persistently adopted with Ms. Kelley, Mr. Delmonico's continued refusal to engage with Ms. Kelley in a collaborative manner, and Mr. Delmonico's repeated actions that hindered Ms. Kelley's ability to accomplish her deliverables continued to foster a negative, hostile, and retaliatory work environment.

126.    On March 6, 2024, in advance of a scheduled meeting, Ms. Kelley emailed Mr. Delmonico to complain about the discrimination and harassment to which she was being subjected on the basis of her sex, and gender-based pay inequality, as well as retaliation, including retaliation she faced for her efforts to maintain legal compliance.

127.    In her email, Ms. Kelley stated, "In advance of today's meeting, I think it is important to acknowledge recent rising tensions and challenges in our working relationship. As the only female executive here, I have struggled with the way that you have treated me, and the differences I have seen in the way that I am compensated, viewed and respected in comparison to my male colleagues. I have also had to grapple with an ongoing resistance to compliance related advice, which has compounded the difficulties of working in this environment. I hope that these issues can be resolved."

128.     Mr. Delmonico sent in his email response that the meeting would have to be postponed so that Lyndy Clementson, Human Resources Business Partner at Escalon Services, "can be available to investigate this in more detail."

129.     Despite the alleged need for time to investigate Ms. Kelley's complaint further, approximately one hour later, Mr. Delmonico sent Ms. Kelley a meeting invitation for the following day, March 7, 2024.

130.     When Ms. Kelley joined the meeting on March 7, 2024, she was informed that Strados was allegedly intending to revert back to an outside counsel model, effectively terminating her employment.

131.     Later that day, Ms. Kelley was sent termination paperwork, including a separation agreement that confirmed that Ms. Kelley's termination was effective March 7, 2024.

132.     Notably, after Ms. Kelley's termination, counsel for Strados claimed that the company had allegedly found "significant legal failures" with respect to Ms. Kelley's employment.

133.     The facts demonstrably prove otherwise.

134.     For example, while Strados asserted that Ms. Kelley failed to obtain additional employment liability coverage, in fact, Ms. Kelley repeatedly suggested increases in this coverage (and other policies) which were delayed and deprioritized by the company in favor of revenue-generating work.

135.     The timing of Ms. Kelley's termination, coupled with the other discriminatory and retaliatory treatment experienced by Ms. Kelley, indicates that Ms. Kelley's termination was the result of discrimination on the basis of her sex, retaliation for her complaints about

discrimination, harassment and unequal pay, and retaliation for objecting to and complaining about legal compliance issues.

136.    The reasons given for Ms. Kelley's termination were pretextual.

137.    Based on the foregoing, Ms. Kelley was subjected to unlawful discrimination and harassment on the basis of her sex, gender-based pay inequality, retaliation for complaining about discrimination and harassment, retaliation for complaining about gender-based pay inequality, and retaliation for objecting to and complaining about legal compliance issues, in violation of Title VII, the MHRA, the EPA and the MWA.

138.    Ms. Kelley has suffered and continues to suffer mental anguish and severe emotional distress as a direct and proximate result of the actions and/or inactions of Defendants.

139.    Defendants and its agents acted with the intent of causing or with reckless disregard for the probability that their actions would cause Ms. Kelley severe emotional distress.

140.    Ms. Kelley has suffered financial losses, which include, among other things, lost wages, and an obligation for attorneys' fees and costs of bringing suit, as a direct and proximate result of the actions and inactions of Defendants.

## <u>COUNT I</u>
### **Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) <u>et seq</u>.**
### **(Plaintiff v. Defendant Strados)**

141.    Plaintiff Ryan Kelley repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

142.    Based on the foregoing, Defendant engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) <u>et seq</u>.

143.     In discriminating against and harassing Ms. Kelley because of her sex, and in retaliating against Ms. Kelley for her complaints of discrimination and harassment, Defendant Strados violated Title VII.

144.     Defendant's violations were intentional and willful.

145.     Defendant's violations warrant the imposition of punitive damages.

146.     As the direct and proximate result of the aforesaid unlawful employment practices engaged in by Defendant Strados, Plaintiff Ryan Kelley has sustained a loss of earnings and bonus payments, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon.

## COUNT II
### The Minnesota Human Rights Act, Minn. Stat. § 363A.01, et seq.
### (Plaintiff v. All Defendants)

147.     Plaintiff Ryan Kelley repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

148.     Based on the foregoing, Defendants engaged in unlawful employment practices in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01, et seq.

149.     In discriminating against and harassing Ms. Kelley on the basis of her sex, and in retaliating against Ms. Kelley for her complaints about discrimination and harassment, Defendant Strados violated the MHRA.

150.     Defendant Nicholas Delmonico aided and abetted Strados' discrimination, harassment and retaliation as alleged herein.

151.     Defendant Nicholas Delmonico retaliated against Ms. Kelley for her complaints of discrimination and harassment as alleged herein.

152.     In aiding and abetting Strados' discrimination, harassment and retaliation, and in retaliating against Ms. Kelley for her complaints, Defendant Nicholas Delmonico violated the MHRA.

153.     Defendants' violations were intentional and willful.

154.     Defendants' violations warrant the imposition of punitive damages.

155.     As the direct and proximate result of the aforesaid unlawful employment practices engaged in by Defendants, Plaintiff Ryan Kelley has sustained a loss of earnings and earning potential, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

### COUNT III
**Minnesota Whistleblower Act, Minn. Stat. § 181.931 et seq.**
**(Plaintiff v. Defendant Strados)**

156. Plaintiff Ryan Kelley repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

157. Ms. Kelley became aware of numerous wrongdoings being committed by Defendant Strados as alleged herein, including, but not limited to, serious legal compliance issues that she believed to be potentially illegal.

158. Ms. Kelley reasonably believed that these compliance issues were illegal under state or federal laws, or both.

159. Ms. Kelley made good-faith reports to Defendant Strados regarding her concerns about the legality of the conduct Strados was engaged in.

160. In retaliation for her reports, Defendant Strados terminated Ms. Kelley in violation of the Minnesota Whistleblower Act.

161. As the direct and proximate result of Defendant Strados' violation of the Pennsylvania Whistleblower Law, Plaintiff Ryan Kelley has sustained loss of earnings, severe emotional and psychological distress, loss of self-esteem, damage to his professional reputation and career, loss of future earning power, as well as back pay, front pay, and interest due thereon, and has incurred attorneys' fees and costs.

### COUNT IV
### Equal Pay Act, 29 U.S.C. § 206(d)
### (Plaintiff v. Defendant Strados)

162.      Plaintiff Ryan Kelley repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

163.      Defendant Strados violated the Equal Pay Act, 29 U.S.C. § 206(d), by paying wages to Ms. Kelley, a woman, at rates less than the rates it pays male employees in the same establishment for equal work on jobs requiring equal skill, effort and responsibility, and performed under similar working conditions.

164.      Defendant Strados violated the Equal Pay Act, 29 U.S.C. § 206(d), by retaliating against Ms. Kelley for her complaints about unequal pay.

165.      Defendant Strados willfully violated the Equal Pay Act.

166.      Defendant Strados' violations of the Equal Pay Act were not in good faith.

167.      Defendant Strados did not have reasonable grounds to believe that its acts or omissions were not violations of the Equal Pay Act.

168.      As a result of Defendant Strados' violations of the Equal Pay Act, Ms. Kelley is entitled to an award of liquidated damages.

169.      As the direct and proximate result of the aforesaid violation of the Equal Pay Act, Plaintiff Ryan Kelley has sustained a loss of earnings and earning potential, severe emotional

and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon, and has incurred attorneys' fees and costs.

### PRAYER FOR RELIEF

170.    Plaintiff Ryan Kelley repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff Ryan Kelley respectfully requests that this Court enter judgment in her favor and against Defendants and Order:

a.  Appropriate equitable relief including reinstatement or front pay;

b.  Defendants to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been subjected to unlawful discrimination and retaliation;

c.  Defendants to compensate Plaintiff with the wages and other benefits and emoluments of employment lost because of Defendant's unlawful conduct;

d.  Defendant Strados to pay Plaintiff liquidated damages;

e.  Defendants to pay Plaintiff punitive damages;

f.  Defendant to pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

g.  Defendants to pay Plaintiff treble compensatory damages as allowed;

h.  Defendant Strados to pay Plaintiff liquidated damages as allowed;

i.  Defendants to pay Plaintiff's costs of bringing this action and her attorneys' fees;

j.  Plaintiff be granted any and all other remedies available pursuant to Title VII, the MHRA, the EPA, the MWA and any other applicable law; and

k.  Such other and further relief as is deemed just and proper.

## **<u>JURY DEMAND</u>**

Plaintiff Ryan Kelley hereby demands trial by jury as to all issues so triable.


By:  *<u>/s/ Jennifer C. Bell</u>*
Jennifer Bell, Esquire
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
1617 John F. Kennedy Boulevard
Suite 1254
Philadelphia, PA 19103
(215) 569-2500

*Attorneys for Plaintiff Ryan Kelley*

Dated: February 11, 2026